# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **LARRY NEWTON, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:15-cv-00294-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| *sued as Nancy A. Berryhill,* | ) | |
| *Acting Commissioner of Social Security,*[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Larry Newton, Jr., appeals to the district court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[2]  (*See* DE 1).  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

On May 24, 2012, Newton filed his application for DIB, alleging disability as of August 31, 2010.  (DE 11 Administrative Record ("AR") 47).  Newton's date last insured for DIB purposes is March 31, 2011 (the "DLI").  (AR 47).  Newton's DIB claim was denied initially on July 18, 2012, and was again denied upon reconsideration on August 28, 2012.  (AR 73-89).  Newton filed a request for a hearing before an Administrative Law Judge (AR 91), and

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge.  (DE 14); *see* 28 U.S.C. § 636(c).

Administrative Law Judge Patricia Melvin (the "ALJ") held a hearing on June 12, 2013, at which Newton and Micha Daoud, a vocational expert (the "VE"), testified. (AR 6-41). Newton was represented by George Merkle, a non-attorney representative, at the hearing before the ALJ. (AR 71-72). On April 10, 2014, the ALJ issued an unfavorable decision, finding that Newton was not disabled because, through the DLI, he was capable of performing a significant number of jobs in the national economy. (AR 47-58). Newton requested the Appeals Council review the ALJ's decision (AR 4), and the Appeals Council denied his request, making the ALJ's decision the final, appealable decision of the Commissioner (AR 64-67).

Newton filed a complaint with this Court on October 9, 2015, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Newton alleges that the ALJ erred by: (1) improperly evaluating his mental condition under agency regulations; (2) failing to consider whether his condition medically equaled Listing 4.12; (3) failing to assign weight to the post-hearing examinations; and (4) improperly evaluating his credibility. (DE 15 at 16-24).

## II. FACTUAL BACKGROUND[3]

### A. Background

At the time of the ALJ's decision, Newton was 47 years old. (AR 10). He has a ninth-grade education and obtained his GED. (AR 11). His employment history includes work as a carpenter and as a construction worker. (AR 36, 328).

### B. Newton's Testimony at the Hearing

At the hearing, Newton testified as follows: Newton lives in a house with his girlfriend

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 679-page administrative record necessary to the decision.

and her two children. (AR 11). His height was five feet, seven inches, and he weighed 160

pounds. (AR 11). He had not had any vocational training since he had left school in the ninth

grade, but he did serve in the Indiana National Guard from 1984 to 1988. (AR 11-12).

Newton's girlfriend is the only source of income in their household, as Newton does not receive

Medicaid, food stamps, unemployment, or worker's compensation, and he was not working.

(AR 12).

Newton last worked in August 2010 for Brad Ashe, a non-union contractor, doing heavy

construction work and hanging heavy sheets of drywall. (AR 12-13). Newton had only been

working for Brad Ashe for about a month when he could no longer do the job because of severe

leg pain, but he had worked in construction for 20 years prior. (AR 12-14). Newton had never

quit a job, and he was never fired, although he was laid off due to the seasonal and temporary

nature of construction jobs. (AR 15-16).

Newton's most severe problem that keeps him from working is the pain he has in both of

his legs with any kind of exertion. (AR 16). He believes his leg pain is caused by peripheral

artery disease, which was diagnosed in January 2011. (AR 16). The pain is in both of his

calves, and it is also in his left thigh. (AR 17). He had stents put in both of his legs in August

2011. (AR 17). Newton's pain worsens with exertion, from walking, climbing stairs, or even

just from sitting for a long period. (AR 17). When he is sitting, his pain is not too bad, but his

legs feel numb and his toes feel tingly. (AR 17). On a scale of zero to 10, with 10 being a trip to

the emergency room for the pain, Newton stated that the pain in his legs with exertion is "at least

an eight or a nine." (AR 17-18). Newton has not had any other treatment for his peripheral

artery disease other than the stents, but he does take medication, including lisinopril, Lovastatin,

the generic form of Plavix, and baby aspirin. (AR 18). Newton stated that the medications "don't seem effective" to him, and just make him dizzy. (AR 18). Newton has no other side effects, besides the dizziness, from his medication. (AR 18). Newton also takes tramadol for pain, which "helps a little bit but not much." (AR 18-19). The pain in Newton's legs is aggravated by squatting, climbing, kneeling, and any kind of exertion. (AR 20). The pain in his legs is better when he is at rest. (AR 20).

Newton has pressure in his chest, which is constant, and shortness of breath, which he believes also keep him from working. (AR 20-21). The pressure in his chest and his shortness of breath worsen with exertion. (AR 22). On a pain scale of 10, the pressure in his chest is "a four or a five." (AR 23). When the pressure worsens, Newton sits and rests, and the more intense pressure goes away in about four or five minutes. (AR 23).

Newton also had gangrene in his right calf, which was cured when the bone and tissue were removed in 1996. (AR 23-24). Because of the bone and tissue removal, Newton's calf muscle tightens up constantly, which impacts his leg mobility and his ability to work. (AR 24). When his calf tightens up, he has to stretch it, but it affects his ability to walk and climb stairs or ladders. (AR 24, 30). When he stretches it out, it releases and then he is more mobile, but it will tighten up again. (AR 30). Newton has not had any treatment for his right calf since 1996. (AR 24).

Newton also has problems with joint pain and arthritis in his knees, ankles, hip, neck, back, and hands. (AR 30). He can still grasp things, but his hands hurt when he gets up in the morning. (AR 30). Newton's arthritis began in 2008, but he has not been treated for it. (AR 33). Newton does not take medication for his arthritis, but his tramadol pain medication also

helps ease his arthritic pain.  (AR 33).  On a scale of one to 10, Newton's pain in his hips, knees, ankles, back, neck, and hands is a "six" when he first gets up in the morning, and it "eases down to a three or a four" after he has been up for an hour.  (AR 34).

Newton stated that he can walk 30 feet without pain; he can stand for 15 to 20 minutes; he can sit for 15 to 20 minutes; he can lift 20 pounds without pain; he is right handed, and he has no problems pushing and pulling with his arms; he can reach out and overhead, and he can use his hands to grip things like doorknobs, cups, glasses, and silverware; he can use his fingers to do things like button buttons, zip zippers, and tie shoelaces; he can use his legs to push a gas or brake pedal; he can climb stairs with difficulty; he can bend over and touch his knees; he can bend over and touch his toes, but it is painful; he does not have problems with his balance; his dizziness comes and goes every day; he has never fallen and does not have any problems dressing himself; he gets in and out of the shower by himself; and he has a driver's license and drives once or twice a month.  (AR 24-27).

Newton does not have any hobbies; he used to lift weights when he was younger, but he cannot do that anymore.  (AR 27).  His girlfriend performs the household tasks, such as the cooking, shopping, dish washing, laundry, vacuuming, sweeping, mopping, making the beds, cleaning, and takes out the garbage.  (AR 27).  Newton mows the grass on a riding lawnmower.  (AR 28).  Newton drinks alcoholic beverages, about five or six beers twice a week.  (AR 28).  Newton has never lost a job or been disciplined at work due to his drinking, but his drinking did cause him to miss some work.  (AR 28).  Newton had not had any problems at work since 2004, when he stopped drinking heavily.  (AR 28-29).  Newton stated that he had not used any illegal drugs since 2004.  (AR 29).

### C.  Summary of the Relevant Medical Evidence

#### 1.  Evidence Prior to the DLI

On July 9, 2009, Newton saw Dr. William Lloyd at Markle Medical Center, who reported that Newton was anxious and experiencing insomnia.  (AR 377).  Dr. Lloyd diagnosed him with hypertension, and prescribed medication for his blood pressure and anti-depressants for insomnia relief.  (AR 377).

On March 8, 2010, Newton was seen by Dr. Deborah Miller.  (AR 376).  Dr. Miller noted that Newton felt depressed as a result of his dog and cat dying.  (AR 376).  Newton told Dr. Miller that the antidepressants prescribed by Dr. Lloyd had not helped with sleep.  (AR 376). Dr. Miller prescribed two new antidepressants, a sedative, and antibiotics, and she referred Newton to a cardiologist. (AR 376).

A year later, Newton saw Dr. Miller again, on February 15, 2011.  (AR 364).  Dr. Miller recorded that Newton had no right pedal pulse and a low palpable left pedal pulse.  (AR 364). Newton's feet were cold, and he exhibited chest pain, headaches, shortness of breath, hypertension, paresthesia in his face and legs, claudication, dizziness, transient visual changes, tunnel vision, and discoloration of his feet.  (AR 364).  Dr. Miller ordered diagnostic tests, but Newton was concerned he would not be able to receive the tests because he was not working and had no way to finance them.  (AR 364).

On Dr. Miller's instructions, Newton saw Dr. Peter Simmons the next day to receive an exam using a multi-detector computed tomography, which scored the calcium level in Newton's blood vessels.  (AR 338).  Newton's calcium score came back as 575.82, which was in the highest percentile associated with a high probability of occlusive coronary artery disease and

increased risk of cardiovascular events.  (AR 338-39).  The same day, Newton received

"Vascular Screening Results" from three different tests:  a carotid artery stroke screening, an

abdominal aneurysm screening, and an ABI-lower extremity screening.  (AR 356).  While two of

the tests showed nothing of concern, the results of Newton's ABI-lower extremity screening

were highlighted as "Bad."  (AR 356).  Dr. Miller's report noted a severe level of claudication

and suggested that Newton's condition was urgent.  (AR 356).

Shortly thereafter, on March 4, 2011, Newton saw cardiologist, Dr. Vincent Scavo.  (AR

359-60).  Newton underwent an ultrasound which showed no signs of an aneurysm but noted that

his ankle brachial index was 0.89 at the left, and 0.54 on the right.  (AR 343).  "His EBT score

showed high risk for calcific coronary artery disease."  (AR 359).  Newton had no femoral pulses

bilaterally, and he reported pressure in his chest "intermittently" when exerting himself.  (AR

359-60).  Dr. Scavo observed that Newton had "a history of life-altering calcification[,]"

shortness of breath, and chest pain with exertion, but he did not recommend a treatment plan.

(AR 360).  However, Dr. Scavo was optimistic about the potential effects of surgery on Newton.

(AR 360).

On March 29, 2011, Newton saw another cardiologist, Dr. Gary Hambel.  (AR 371-72).

Dr. Hambel performed an exam and found the following:  "significant dyspnea on exertion and

occasion chest discomfort"; "significant risk factors for ischemic heart disease"; "[s]ymptoms

consistent with significant ischemic heart disease and unstable angina"; "[s]evere peripheral

vascular disease with significant bilateral lower extremity claudications"; "[h]ypertension"; and

"[u]ntreated hyperlipidemia."  (AR 371).  The report cautioned that Newton could "potentially

need catheterization from the arm."  (AR 371).

Two days later, on March 31, 2011, Newton saw Dr. Miller again.  (AR 374).  Newton had ceased working and had "no prescription coverage."  (AR 374).  Newton was "very anxious."  (AR 374).  Dr. Miller diagnosed Newton with:  (1) acute sinusitis/bronchitis; (2) peripheral vascular disease; (3) coronary disease with chest pain; (4) mild carotid disease; (5) hypertension; (6) hyperlipidemia; and (7) bilateral claudication.  (AR 374).  Dr. Miller prescribed medication and suggested "check up[s] after tests."  (AR 374).

## 2.  Evidence After the DLI

On April 5, 2011, Newton saw Dr. Vijay Chilakamarri, who performed a coronary angiogram and peripheral angioplasty.  (AR 383-89).  These tests showed that Newton exhibited moderate calcification with no significant focal coronary artery disease that would require intervention, critical stenosis of the right, and left external iliac arteries with successful percutaneous transluminal angioplasty stenting using bare metal stents, and intermediate grade right and left common femoral artery disease.  (AR 383-89).  Artery stenting reduced ulcerated stenosis from 85-90 percent to zero percent, and right common to external iliac stenting reduced subtotal stenosis from 99 percent to zero percent.  (AR 384).

On August 24, 2011, Newton saw Kimberly Butcher, MS, LMHC, on a referral from Wells County Probation.  (AR 397).  Ms. Butcher noted that Newton suffered from "[m]ental issues potentially impacting treatment includ[ing] depression and anger."  (AR 397).  Given his state of stress and history of alcohol abuse, Newton was "at very high risk to relapse to full alcohol dependence."  (AR 397).  Ms. Butcher noted that Newton had problems in the workplace with aggression and attendance, and opined that Newton's history was marked by job loss mostly due to economic downturn.  (AR 400).  Newton showed mild adjustment problems

largely due to past trauma and previous criminal charges. (AR 400). Newton would become

verbally aggressive when he drank, and Ms. Butcher diagnosed Newton with alcohol abuse,

assigning him a Global Assessment of Functioning ("GAF") score of 62.[4] (AR 400-02). In

addition, Ms. Butcher noted Newton exhibited symptoms of depression, insomnia, difficulty in

social or occupation settings, but otherwise able to function and maintain interpersonal

relationships. (AR 402-03). Ms. Butcher observed that Newton's issues with physical and

mental health could affect the treatments available to him. (AR 397). Following this evaluation,

Ms. Butcher became Newton's primary therapist. (AR 397).

On January 5, 2012, Karen Lothamer, CNS, and Dr. Ronald Pancer performed a

psychiatric evaluation of Newton at Park Center. (AR 431-34.). Newton's "Chief Complaint"

was that he had "real high anxiety" and that when he used alcohol to cope with the anxiety, he

became "extremely violent" resulting in nine charges for battery and incarceration. (AR 431).

The report observed that Newton presented with the following: depression, mood fluctuation,

agitation, violence, homicidal ideation, paranoia, a history of abuse or trauma, anxiety, panic

attacks, agoraphobia, and sleep problems. (AR 430-31). This report affirmed Dr. Butcher's

GAF score of 62. (AR 433). Ms. Lothamer and Dr. Pancer prescribed antipsychotic and

antianxiety medications. (AR 433). They created a treatment plan for Newton that included his

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 61 to 70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficult in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, and has some meaningful interpersonal relationships. *Id.* "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, Ms. Butcher used a GAF score in assessing Newton, so the GAF is relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

attendance at subsequent appointments.  (AR 411).  However, Newton's attendance was poor, as he failed to appear for any appointments after March 2012.  (AR 411).

Joelle Larsen, Ph.D., a psychologist for the Disability Determination Bureau (the "DDB"), reviewed Newton's record and completed a "Psychiatric Review Technique" on July 13, 2012.  (AR 448-60).  Dr. Larsen found "insufficient evidence" of a medically determinable mental impairment or the equivalent of a medically determinable mental impairment in Newton. (AR 448-60).  Donna Unversaw, Ph.D., also a DDB psychologist, later affirmed this report.  (AR 470).

On July 5, 2012, Dr. John Greenman performed an evaluation of Newton, including Newton's psychological and physical history in the past six years.  (AR 463-68).  Newton reported to Dr. Greenman that he had peripheral artery disease (AR 463) and atrophy in his right calf (AR 466).  Newton reported that he had difficulty working due to his leg and chest pain; he could not lift heavy loads; and he had significant limitations standing walking, lifting, pushing or pulling, squatting, crawling, and climbing.  (AR 466-68).  Newton also told Dr. Greenman that he had difficult getting along with others, sleeping issues, and violent behavior.  (AR 463, 465). Although Dr. Greenman made no diagnosis, his report notes that Newton had not been adequately treated for anxiety and a bipolar disorder.  (AR 463, 465).  Dr. Greenman opined that Newton's behavioral issues would continue because Newton denied "psychosis."  (AR 467).

Soon after that, Dr. Richard Wenzler, a state agency physician, reviewed Newton's record and concluded that there was insufficient evidence to establish a disabling physical condition prior to the DLI.  (AR 469, 471).

On April 10, 2013, Dr. Greenman saw Newton again.  (AR 488).  In Dr. Greenman's

opinion, Newton's heart condition had deteriorated somewhat. (AR 488). He also diagnosed

Newton with osteoarthritis in his knees, back, and hips. (AR 488). Dr. Greenman also reiterated

his previous opinions. (AR 489).

### 3. Post-Hearing Evidence

On September 10, 2013, Newton submitted to Dr. Babatunde Onamusi for a physical

examination. (AR. 645-47). Dr. Onamusi reported that Newton exhibited weak dorsalis pedis

pulses bilaterally with palpable posterior tibial pulses. (AR 646). Although Dr. Onamusi gave a

diagnosis of coronary artery disease with peripheral arterial disease, he opined that Newton

could perform sedentary work and activities as defined by the *Dictionary of Occupational Titles*

(the "DOT"). (AR 646-47). Dr. Onamusi also evaluated Newton's "ability to do work-related

activities (physical)." (AR 649). Dr. Onamusi opined that Newton could lift and carry up to 20

pounds, sit for two hours without interruption (for a total of six hours in an eight-hour work day),

and stand or walk for 30 minutes without interruption (a total of three to four hours in an eight-

hour work day). (AR 649-50). Newton could occasionally climb stairs and ramps, but never

climb ladders or scaffolds. (AR 652). Newton could only occasionally stoop, kneel, crouch, or

crawl. (AR 652).

Mr. Merkle, Newton's non-attorney representative, claimed that Dr. Onamusi's findings

that Newton could tie knots, button buttons, tie shoelaces, pick up coins, hold pens, turn door

handles, zip zippers, and perform fine fingering movements was baseless because Newton did

not perform these tasks during the exam. (AR 658). Dr. Onamusi responded that he obtained

adequate and relevant information from Newton. (AR 663). Dr. Onamusi maintained that his

report was accurate but acknowledged that Newton had different expectations of the

examination.  (AR 663).

On October 22, 2013, Newton submitted to another post-hearing examination by Dr. Milissa Eley-Alfrey.  (AR 664-70).  Dr. Eley-Alfrey opined that Newton could walk half a block, stand for 15 minutes, and lift 20 pounds on both the left or the right (40 pounds with both arms). (AR 665).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Id.*

# IV. ANALYSIS

## A. The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A medically determinable physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether Newton is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required her to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"), or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 404.945(a)(5).

disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Id.* at 885-86.

### B. The ALJ's Decision

On April 10, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision.  (AR 47-58).  At step one, the ALJ found that Newton had not engaged in substantial gainful activity since his alleged onset date of August 31, 2010, through the DLI of March 31, 2011.  (AR 49).  At step two, the ALJ found that Newton had the following severe impairments through the DLI:  peripheral vascular disease; hypertension; osteoarthritis; history of gangrene with surgery to the right calf; and moderate coronary calcification with nonobstructive left main and LAD disease.  (AR 49).  At step three, the ALJ found that, through the DLI, Newton did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 51).

Before proceeding to step four, the ALJ determined that Newton had, through the DLI:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except:  lifting and carrying up to 20 pounds occasionally and ten pounds frequently; stand/walk about two hours in an eight-hour workday and sit about six hours in an eight-hour workday, with normal breaks; never climbing ladders, ropes, scaffolds, ramps, or stairs, and never crouch or crawl; occasionally balance, stoop, and kneel; and, limited to jobs with no production rate or pace work.

(AR 52).  At step four, the ALJ considered this RFC and the VE's testimony before finding that Newton could not perform his past relevant work.  (AR 57).  The ALJ then concluded at step five that Newton was not disabled through the DLI because there were jobs that existed in

significant numbers in the national economy that Newton could have performed. (AR 57). Accordingly, the ALJ determined that Newton was not disabled from August 31, 2010, the alleged onset date, through March 31, 2011, the DLI. (AR 58). Newton's claim for DIB was therefore denied. (AR 58).

### C. The ALJ Adequately Assessed Evidence of Newton's Alleged Medically Determinable Mental Impairments

Newton claims that the ALJ's conclusion that he did not have a medically determinable mental impairment as of the DLI was not based on substantial evidence. Newton raises two arguments on this point: (1) the ALJ should have evaluated Newton's mental condition under the so-called "B criteria," *see* 20 CFR pt. 404 Subpart P, App. 1, § 12.00 *et seq.*; 20 C.F.R. § 404.1520a(d), and (2) the ALJ's error at step two (finding Newton did not have a medically determinable impairment) affected the RFC determination. For the reasons provided below, neither argument is persuasive.

By way of a brief summary, the ALJ determined that Newton had not established a medically determinable mental impairment based on the following circumstances: (1) Newton's failure to assert the existence of a medically determinable mental impairment until after the hearing before the ALJ (AR 49-50); (2) the lack of evidence of symptoms or treatment for a medically determinable mental impairment leading up to the DLI (AR 50); (3) the lack of a mental diagnosis (AR 51); (4) Dr. Greenman's report (observing that Newton was not adequately treated for bipolar disorder) took place on his first consultation with Newton (AR 50); and (5) there was no evidence of more than "mild [mental] limitations . . . ." (AR 51).

1. The ALJ's Determination at Step Two

Newton's first argument is that the ALJ erred in not using the B criteria when determining whether he had a medically determinable mental impairment at step two. "Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (emphasis in original) (citing *Castile v. Astrue*, 617 F.3d 923, 927-28 (7th Cir. 2010)). After finding any severe impairment at step two, "any error of omission [is] harmless." *Id.* (citing *Castile*, 617 F.3d at 927-28). Here, although the ALJ found at step two that Newton failed to establish a medically determinable mental impairment at or before the DLI (AR 53-55), she did determine that Newton had other severe impairments (AR 49), and accordingly proceeded on to step three. It follows that even if the ALJ did err in her evaluation at step two, it was a "harmless" error. *Arnett*, 676 F.3d at 591. Consequently, the Court will not disturb the ALJ's finding at step two, even if Newton is correct that she erred by finding that Newton did not have a medically determinable mental impairment.[6]

2. The ALJ's RFC Determination

Second, Newton argues that the ALJ's error at step two resulted in a faulty RFC determination. Essentially, Newton is rephrasing his "step-two argument" as an "RFC argument." *See id.* (finding that the claimant's step-two argument "boil[ed] down to" an

---

[6] Typically, an ALJ evaluates the degree of limitation caused by a claimant's medically determinable mental impairment using the B criteria after concluding that the claimant has a medically determinable mental impairment based on the claimant's symptoms, signs, and laboratory findings. *See, e.g.*, *Pepper v. Colvin*, 712 F.3d 351, 365 (7th Cir. 2013); *Sneed v. Colvin*, No. 2:13-CV-279-PRC, 2014 WL 4987976, at *6 (N.D. Ind. Oct. 7, 2014). In this case, the ALJ found that Newton did not have a medically determinable mental impairment (AR 49) and, therefore, would understandably not reach the issue of determining the degree of limitations imposed by a medically determinable mental impairment under the B criteria. However, since any error at step two would be harmless, the Court does not analyze this issue. *See Arnett*, 676 F.3d at 591.

overstated RFC determination); *Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008) ("We cannot conclude that it was harmless here because the ALJ's failure to consider the functional impairments during the special technique analysis was compounded by a failure of analysis during the mental RFC determination . . . ."); *Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *22 (N.D. Ill. Nov. 18, 2011) (rephrasing the claimant's argument that the "ALJ erred by not including her mild Step Two mental limitations in the RFC"). The RFC determination identifies what tasks a claimant can perform, taking into account his or her limitations. 20 C.F.R. § 404.1545(a)(1). Social Security Ruling 96-8 states:

> It is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the individual had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.).

SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

Newton is correct that the ALJ mentioned little evidence of limitations caused by a medically determinable mental impairment in the section of her opinion regarding Newton's RFC. However, the Court is not required to read the opinion using "tidy packaging"; rather, the Court reads the ALJ's opinion "as a whole and with common sense." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-69 (7th Cir. 2010) (citations omitted). Nevertheless, Newton argues that the ALJ failed to consider the following: (1) his history of taking medication for mental impairments, (2) his failure to seek treatment was a symptom of his alleged medically determinable mental impairments, and (3) other evidence in the record that contradicted the ALJ's conclusion.

Turning to Newton's first argument, the only medication for mental impairments that

Newton was prescribed before the DLI were antidepressants. "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *see Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[T]he primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." (citation omitted)). Newton acknowledges that the record otherwise lacks evidence of mental treatment before the DLI. (DE 15 at 17). Moreover, the ALJ did consider that Newton took these antidepressants but noted that they were prescribed to provide insomnia relief.[7] (AR 50). The ALJ also observed that Newton did not seek any mental health treatment until five months after the DLI, and did not do so voluntarily, but rather as a condition of probation. (AR 50). Based on these facts, the ALJ determined that Newton's history of treatment did not establish a medically determinable mental impairment. (AR 51). Therefore, the ALJ's determination was not patently wrong because she considered and "connect[ed] the evidence to the conclusion." *Arnett*, 676 F.3d at 592.

In Newton's second argument, he claims that the ALJ should have viewed the fact that he failed to seek treatment for a medically determinable mental impairment, resulting in a lack of evidence, as a symptom of his mental disorders. (DE 15 at 17 (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009); SSR 83-20, 1983 WL 31249 (Jan. 1, 1983)). The problem for Newton, as observed by the ALJ, is that he did not seek treatment for a mentally determinable mental impairment while he *was* insured, from the alleged onset date of August 31, 2010, to the DLI of March 30, 2011. (AR 49-50). "[T]here is no evidence in the record

---

[7] Despite prescribing medication to help with sleep, Dr. Miller did not diagnose Newton with insomnia.

explaining [Newton]'s failure to seek treatment during this" eight-month period. *White*, 572

F.3d at 284. Further, the ALJ observed that Newton did not begin mental treatment voluntarily;

rather, he was compelled to do so as a condition of probation. (AR 50). Thus, the Court will not

disturb the ALJ's determination that Newton has failed to carry his "burden of supplying

adequate records and evidence to prove [his] claim of disability." *Scheck*, 357 F.3d at 702

(citing 20 C.F.R. § 404.1512(c); *Bowen*, 482 U.S. at 146 n.5).

Finally, Newton argues that the ALJ failed to consider other evidence that contradicted

her conclusion that Newton did not have a medically determinable mental impairment. "[T]he

administrative law judge is not required or indeed permitted to accept medical evidence if it is

refuted by other evidence—*which need not itself be medical in nature . . . .*" *Simila v. Astrue*,

573 F.3d 503, 515 (7th Cir. 2009) (alteration in original) (quoting *Wilder v. Chater*, 64 F.3d 335,

337 (7th Cir. 1995)); *see also Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir.

2005). "But where there is no such evidence, the ALJ cannot . . . disregard the medical opinion."

*Briscoe ex rel. Taylor*, 425 F.3d at 345.

 In this case, the ALJ's conclusion was justified by evidence in the record. Although the

ALJ did not discuss in detail the opinions of Drs. Larsen and Unversaw, the state agency

psychologists who determined that there was insufficient evidence to establish a medically

determinable mental impairment prior to the DLI, she did explain why other professional

opinions did not establish a medically determinable mental impairment. (*See* AR 50); *see also*

*Arnett*, 676 F.3d at 592 ("Although an ALJ need not mention every snippet of evidence in the

record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore

entire lines of contrary evidence."). The ALJ observed that Dr. Greenman's report that Newton

suffered from bipolar disorder was not entirely credible because this report occurred on their first meeting and because Dr. Greenman did not diagnose Newton with bipolar disorder. (AR 50). The ALJ observed that in Ms. Butcher's report, Newton's anxiety and behavioral issues were related to alcohol use. (AR 50). Finally, Dr. Miller, Dr. Lloyd, and Ms. Lothamer reported that Newton presented with anxiety or a depressed mood, but these mere observations did not amount to a "diagnosis or treatment." (AR 51). Moreover, the ALJ's conclusion that there was insufficient evidence to establish a medically determinable mental impairment, is the same conclusion that both state agency psychologists reached. (AR 448-60, 470). Therefore, the Court will affirm the ALJ's conclusion that Newton did not establish a medically determinable mental impairment because this conclusion is supported by substantial evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).

### D. The ALJ's Determination at Step Three Was Supported by Substantial Evidence

At step three of the analysis, the ALJ determines whether the claimant's impairment meets or equals one of the impairments provided by the Commissioner. *See* 20 C.F.R. § 404, pt. P, App'x 1. The ALJ in Newton's case determined that his impairments failed to meet or equal listing-level impairments. (AR 51). Because, the ALJ's decision was supported by substantial evidence, the Court will not disturb her findings.

The Seventh Circuit has not required a lengthy articulation at step three. *Wurst v. Colvin*, 520 F. App'x 485, 488 (7th Cir. 2013) ("The ALJ's [one-sentence] analysis here was cursory, but it was nevertheless supported by substantial evidence that Wurst could ambulate effectively."). "A claimant may [] demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a

specific listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing 20 C.F.R. §

404.1526(a)). "In considering whether a claimant's condition meets or equals a listed

impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis

of the listing." *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015). "The responsibility for

deciding medical equivalence rests with the administrative law judge or Appeals Council."

*Barnett*, 381 F.3d 664, 668 (citing 20 C.F.R. § 404.1526(e)(3)) (collecting cases); *see Foster v.

Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917).

Here, the ALJ found that the resting ankle/brachial systole blood pressure ratio in one of

Newton's feet was 0.54, which, although close to the 4.12 listing level for peripheral artery

disease of less than 0.50, falls short of the listing level. (AR 51). Newton asserts that the ALJ

was required to discuss whether Newton's impairments were medically equivalent to a listing at

step three because of the combination of his other independently severe impairments

(hypertension, osteoarthritis, history of gangrene, and moderate coronary calcification with non-

obstructive left main and LAD disease) and the nearness of his brachial index to the listing level

for peripheral artery disease. Additionally, Newton claims the ALJ was required to call upon a

medical expert to assist in this equivalence determination.

The problem for Newton is that the ALJ's explanation was more than perfunctory, *see

Minnick*, 775 F.3d at 936; *Wurst*, 520 F. App'x at 488, and the ALJ explained why Newton

failed to satisfy the requirements for the specific listing for a disability, *see Barnett*, 381 F.3d at

668. Further, despite Newton's insistence to the contrary, the Seventh Circuit recognizes that the

ALJ has discretion whether to call an expert or review medical equivalence; she was not required

to do so.[8]  *Barnett*, 381 F.3d at 668 (citing 20 C.F.R. § 404.1526(e)(3)) (collecting cases); *see*

*Foster*, 279 F.3d at 355 (citing 20 C.F.R. §§ 404.1517, 416.917).  In any event, Newton fails to

direct the Court to any evidence in the record that the ALJ did not consider "supporting the

position that his impairments me[t] or equaled a particular listing."[9]  *Knox v. Astrue*, 327 F.

App'x 652, 655 (7th Cir. 2009).  Therefore, the Court will not disturb the ALJ's finding at step

three because "[s]ubstantial evidence exists to support the ALJ's conclusion" that Newton's

impairments did not meet or equal one of the listings provided by the Commissioner.  *Foster*,

279 F.3d at 354.

### E.  The ALJ Did Not Err in Evaluating the Post-Hearing Testimony

Newton asserts that the ALJ's alleged failure to assign any weight to the reports of Drs.

Onamusi and Eley-Alfrey, who evaluated Newton's health after the administrative hearing.  Dr.

Onamusi determined that Newton could stand for 30 minutes at a time for three-to-four hours

total, walk for 30 minutes without taking a break, and occasionally push or pull objects, and that

he required environmental restrictions.  (AR 649-54).  Dr. Eley-Alfrey opined that Newton could

walk about a half a block, stand for 15 minutes at a time, climb 10 steps on stairs without

stopping, and lift 20 pounds with each arm or 40 pounds in both arms.  (AR 665).  Newton

claims these opinions undermine the ALJ's RFC determination that he could carry up to 20

---

[8] Newton claims that the ALJ was required to determine the medical equivalence of his conditions under 20 C.F.R. § 404.1526.  (DE 15 at 20).  However, 20 C.F.R. § 404.1526 details how the ALJ is to determine medical equivalence, not when she is required to employ such a determination.

[9] Newton also argues that the ALJ was obligated to call upon a medical advisor to determine the onset date of his disabling impairment.  (DE 15 at 21 (citing SSR 83-20, 1983 WL 31249)).  Newton fails to appreciate that SSR 83-20 only requires an ALJ to call upon a medical advisor where the onset date is not clear.  SSR 83-20, 1983 31249, at *3.  Here, the ALJ found no disabling impairment, obviating any need for the opinion of a medical advisor. In any event, the determination of whether to request an additional medical opinion is fully within the ALJ's discretion.  *Foster*, 279 F.3d at 355 (citing 20 C.F.R. §§ 404.1517, 416.917).

pounds occasionally and 10 pounds frequently; stand or walk about two hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally balance, stoop, or kneel; but never crouch, craw, or climb ladders, ropes, scaffolds, ramps, or stairs. (AR 52).

The ALJ reviewed the opinions of Drs. Onamusi and Eley-Alfrey and concluded that the record did not "establish that symptoms related to peripheral vascular disease would have prevented [Newton] from sustaining the demands of sedentary work-related activities." (AR 55). Even though this language does not adopt the opinions given in the post-hearing examinations, it is important that neither opinion appears to be inconsistent with the ALJ's RFC determination. In fact, the ALJ's RFC determination restricted Newton to sedentary work (AR 55, 57), which corresponds to the opinion of Dr. Onamusi (AR 647). The only evidence in the post-hearing examinations that may be inconsistent with the ALJ's RFC determination is Dr. Eley-Alfrey's opinion that Newton's peripheral artery disease was worsening. (AR 664).

Even if, as Newton contends, the ALJ's RFC determination contradicted the post-hearing examinations, the ALJ was entitled to reject their conclusions. Again, the ALJ "is not required or indeed permitted to accept medical evidence if it is refuted by other evidence . . . ." *Simila*, 573 F.3d at 515 (quoting *Wilder*, 64 F.3d at 337); *see also Briscoe ex rel. Taylor*, 425 F.3d at 356. In this case, the ALJ relied on Dr. Greenman's reports in determining Newton's RFC rather than the reports of the post-hearing physicians. Dr. Greenman's report indicated that he did not endorse a heart disease classification, as Newton's condition was improving from stenting and he showed no dyspnea or angina. (AR 55-56). Further, neither post-hearing opinion was entitled to favor as a treating physician over Dr. Greenman's opinion. *See Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) ("This is not a case where a treating physician's opinion was

disregarded in favor of the opinion of a consulting physician." (citation omitted)); *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (citations omitted); 20 C.F.R. § 404.1527(a)-(d).  Thus, the ALJ was entitled to reject the opinions of Drs. Onamusi and Eley-Alfrey and accept the contrary opinion of Dr. Greenman.

Additionally, although the ALJ "did not explicitly weigh every factor while discussing her decision to reject" the post-hearing examinations, *Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (citations omitted), she did not consider these opinions of much value, having been conducted "more than two years after the DLI."  (AR 55).  In other words, "[t]he ALJ evaluated the evidence submitted by the many medical experts in this case and where that evidence was conflicting, [s]he resolved those conflicts by giving more weight to some evidence and less to others."  *Young*, 362 F.3d at 1001.  Consequently, the Court will not disturb the ALJ's findings as to the post-hearing examinations because they were based on substantial evidence.  *Schmidt*, 395 F.3d at 744 (citation omitted).

### F.  The ALJ Properly Evaluated the Credibility of Newton's Testimony

Newton's final argument is that the ALJ improperly discounted the credibility of his symptom testimony.  As explained below, the ALJ's credibility determination will not be disturbed.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness.  *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Nelson v. Apfel*, 131 F.3d 1228, 1237-38 (7th Cir. 1997).  If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted),

creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) ("[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." (citations omitted)).

The ALJ found that Newton's testimony regarding "the intensity, persistence, and limiting effects of [his] symptoms [was] not entirely credible." (AR 53). Newton takes issue with the following aspects of the ALJ's determination: (1) Newton was looking for work after he applied for DIB; (2) Newton applied for DIB more than one year after stenting, which alleviated symptoms of his peripheral artery disease; and (3) Newton's symptoms were not supported by objective evidence in the record.

## 1. Newton Was Looking for Work After Applying for DBI

First, Newton claims that the ALJ could assess his credibility using only seven specifically enumerated criteria listed in SSR 96-7p.[10] (DE 15 at 23-24 (citing SSR 96-7p, 1996 WL 374186 (July 2, 1996))). SSR 96-7p provides that, when assessing the credibility of an individual's statements regarding symptoms, the level of severity of the symptoms can be shown by different forms of evidence including the following factors:

---

[10] Social Security Ruling 96-7p was superseded by Social Security Ruling 16-3p in March 2016, *see* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), but Social Security Ruling 96-7p governed at the time the ALJ issued his decision, which Newton observes in his reply brief (DE 19 at 8). Accordingly, SSR 96-7p applies to this case.

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. However, the Seventh Circuit has determined that "the ALJ's credibility decision rests on much more" than those seven criteria. *Sawyer v. Colvin*, 512 F. App'x 603, 607 (7th Cir. 2013). Therefore, Newton is incorrect in claiming that the ALJ's credibility determination was limited to those criteria.

Newton's argument goes on to claim that the ALJ erred by equating Newton's job search with his ability to work. But "it is appropriate for the ALJ to consider any representations [Newton] has made to state authorities and prospective employers that he can work." *Knox*, 327 F. App'x at 656 (citing *Schmidt*, 395 F.3d at 746). Further, it is important that this is not a situation where the claimant looked for employment while merely claiming to suffer from disability; rather, Newton was actively looking for employment following his application for DIB. *Cf. Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016) ("While a claimant's statements in applying for work following a disability claim might be relevant to her credibility when the statements undermine the basis for her claim, such is not the case here."). Therefore, it was

within the ALJ's discretion to consider that Newton's "efforts to find work" undermined his credibility. *Anderson v. Astrue*, No. 09 C 2399, 2011 WL 2416265, at *18 (N.D. Ill. Jun. 13, 2011).

## 2. Newton Received Stents in His Legs in August 2011

Second, Newton argues that the ALJ was not permitted to consider the timing between his stenting surgery and his application for DIB in the credibility determination.[11] Contrary to his assertion, "the ALJ was permitted to consider the effectiveness of treatment, including surgery . . . , in making her credibility determination." *Molnar v. Astrue*, 395 F. App'x 282, 288 (7th Cir. 2010) (citing 20 C.F.R. § 404.1529(c); *Terry*, 580 F.3d at 477). Newton does not dispute that he received stents in his legs in August 2011, which temporarily relieved his symptoms. (AR 54). Therefore, the ALJ appropriately considered Newton's stenting in assessing his credibility. Conversely, Newton "points to no medical evidence to support" his allegations concerning his symptoms. *Molnar*, 395 F. App'x at 288. Thus, the ALJ was not patently wrong to consider in her credibility determination the time between when Newton received stents and when he filed for DIB.

## 3. The ALJ's Credibility Determination Is Supported by the Record

Finally, Newton claims that the ALJ erred by finding his testimony lacked credit because it was not supported by the record. Newton argues that the ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." (DE 19 at 8 (quoting *Carradine*, 360 F.3d at 753)). However, this is not a

---

[11] Newton also claims that such a fact is not one of the criteria enumerated in SSR 96-7p. However, the Court discussed this argument *supra*, and accordingly does not address it here.

case where the claimant's pain was primarily psychological in origin as in *Carradine*, 360 F.3d at 755.  Neither is this a case where the ALJ discredited the claimant's pain testimony without evidence supporting that decision.  *See Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("But as numerous cases (and the Social Security Administration's own regulation) make clear, an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain but only the applicant's or some other witness's say so . . . .").  Rather, the ALJ justified her doubts as to Newton's symptom testimony based on the opinion of Dr. Scavo (AR 53 (noting that Newton had an "active lifestyle")), the fact that Newton ceased visiting Dr. Miller following stenting indicated an improvement in his symptoms (AR 54), and Dr. Greenman's report that stenting appeared to relieve Newton's leg pain for some time (AR 54).  Even in considering this evidence, the ALJ still limited Newton's RFC to "sedentary work-related activities" due to leg pain caused by peripheral artery disease.  (AR 55, 56).  Thus, it is not clear, and Newton does not argue, how assigning more weight to the credibility of his symptom testimony would have changed the RFC determination.  Again, "an ALJ's credibility assessment will stand 'as long as [there is] some support in the record.'"  *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (alteration in original) (quoting *Schmidt*, 496 F.3d at 842).  Accordingly, the ALJ's credibility determination as to Newton's pain and symptom testimony are not patently wrong, and the Court will not reverse those decisions.

## V.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED.  The Clerk

is directed to enter a judgment in favor of the Commissioner and against Newton.

SO ORDERED.

Entered this 22nd day of November 2017.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge